UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MOUNA KANDY SUBOH, individually, as administratix of the ESTATE of ISHAQ SUBOH, and as next friend of her minor daughter SOFIA KANDY, ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | CIVIL ACTION NO. 00-10396-WGY |
| CITY OF REVERE, MASSACHUSETTS, CARL BORGIOLI, STEVEN PISANO, JOHN McRAE, STEVEN WALLACE, THEODORE MICHALSKI, JULIEANN MALVAROSA, ANTONIO ARCOS, JOHN M. AZZARI, RICHARD BACHOUR, and MICHAEL MURPHY, individually and in their official capacities and the OFFICE OF THE DISTRICT ATTORNEY FOR SUFFOLK COUNTY, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

MEMORANDUM AND ORDER

YOUNG, C.J.                                     March 30, 2001

I.   Introduction

     This civil rights matter arises from a dispute over the

custody of Sofia Kandy ("Sofia"), a resident and citizen of



Morocco and the eight-year-old child of Mouna Kandy Suboh

("Mouna").  Mouna and Sofia contend that nine City of Revere

police officers (the "police defendants"), working in concert

with Michael Murphy ("Murphy"), the Assistant District Attorney,

violated the constitutionally protected rights derived from their

familial relationship with each other.  Murphy and the Office of

the District Attorney for Suffolk County ("District Attorney's

Office") have moved to dismiss the complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).  Relevant to the present

motion, therefore, are the counts that Mouna and Sofia now

assert against Murphy and the District Attorney's Office:

(1) liability of the District Attorney's Office and Murphy

under the Massachusetts Tort Claims Act to Mouna (Count II); and

(2) liability of Murphy under 42 U.S.C. § 1983 to Mouna and Sofia

(Counts IV and X).

The motion to dismiss, filed on August 1, 2000, was

initially directed toward the Original Complaint.  On September

8, 2000, however, the plaintiffs filed an assented-to motion to

amend, Fed. R. Civ. P. 15(a), and attached the Amended Complaint.

The Court allowed the motion to amend on September 12, 2000.  The

Court therefore considers the motion to dismiss as it applies to

the Amended Complaint.  This Court heard arguments with respect

to this motion on September 27, 2000, and took the matter under

advisement.  The Court now concludes that the motion should be denied in part and granted in part.

## II.  Factual Background[1]

In 1969, Mouna was born to a wealthy and influential family in Casablanca in the Kingdom of Morocco.  Am. Compl. ¶ 23.  In 1991, while in Morocco, she became pregnant out of wedlock with Sofia.  Id. ¶ 24.  Mouna's parents, Mustapha Kandy ("Mustapha") and Rahima Kandy ("Rahima") (collectively "the Kandys"), attempted to force Mouna to have an abortion because of the perceived shame she had brought to her family.  Id. ¶ 25. Instead, Mouna severed ties with her family and fled to Holland, where Sofia was born on April 9, 1992.  Id. ¶¶ 25-26.

Shortly after Sofia's birth, Rahima traveled to Holland and eventually convinced her daughter to return to Casablanca.  Id. ¶¶ 27-28.  In Morocco, the Kandys allowed Mouna to live in their household, but began to raise Sofia as their own child without Mouna's consent.  Id. ¶ 29.  Although Mouna protested, she did not immediately take legal action.  Id.  Rather, from 1992 to 1995, Mouna continued to live with her parents and to maintain regular contact with Sofia.  Id. ¶ 31.  At some point, the Kandys

---

[1] For purposes of this motion to dismiss, the Court takes all allegations in the complaint as true and draws all reasonable inferences in the plaintiffs' favor.  Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co., 214 F.3d 216, 223 n.6 (1st Cir. 2000).

falsified a birth certificate, which purported to demonstrate that Rahima was Sofia's natural mother, and Rahima used that birth certificate as legal evidence of her parental relationship. Id. ¶ 30.

In 1995, Mouna met a United States citizen, Ishaq Suboh ("Ishaq"). Id. ¶ 32. On September 7, 1995, Mouna moved to the United States, and on September 13, 1995, she married Ishaq. Id. ¶ 32. The Kandys had earlier promised to send Sofia to Mouna and Ishaq after they were settled in the United States, but the Kandys did not honor that promise. Id. With substantial assistance from Ishaq, Mouna made extensive, but unsuccessful, attempts to obtain physical custody of Sofia, including four trips to Morocco. Id. ¶ 33. Her attempts to force a change of physical custody through the Moroccan judicial process also failed, not because the case was decided on the merits by a court but because the case "disappeared" under suspicious circumstances. Id. By visiting, calling, and writing letters, Mouna maintained her relationship with Sofia at all times prior to May 1998. Id. ¶ 34.

Morocco has a national identity system through which each person is registered with the government. Id. ¶ 35. Morocco officially recognizes Mouna as Sofia's legal mother. Morocco does not allow adoptions. Id.

4

In 1998, Mouna's opportunity to obtain custody of her child from her parents arose, but was hindered by the involvement of Michael Murphy and the police defendants.  That year, the Kandys traveled to Massachusetts so that Mustapha could receive medical treatment at Massachusetts General Hospital.  Id. ¶ 36.  The Kandys brought Sofia with them and stayed with Mouna and Ishaq in their apartment in Revere.  Id.  After receiving advice from representatives of the City of Boston on or about May 26, 1998, Mouna and Ishaq took Sofia from their apartment and concealed their location from the Kandys.  Id. ¶ 37.  They kept with them all of the papers that demonstrated that Mouna was Sofia's mother and the Kandy's falsification of the birth certificate.  Id.  On May 27, 1998, Mustapha reported to the Revere Police Department that his daughter, Sofia, had been kidnaped by his son-in-law, Ishaq.  Id. ¶ 38.  Mustapha further reported that Mouna was married to Ishaq and was with them.  Id.  On May 28, 1998, officers of the Revere Police Department conducted an interview of the Kandys, who reported that Ishaq had kidnaped Sofia and stolen a Rolex watch.  Id. ¶ 39.  The Kandys also told the police that Ishaq was having financial troubles and that he was attempting to obtain money from them.  Id.  After a period of two days, and with the assistance of agents from the Federal Bureau of Investigation, the Revere police located Mouna and Sofia in a

hotel room.  Id. ¶ 40.  On the morning of May 29, 1998, two

detectives went to the room and found Mouna and Sofia.  Id. ¶ 41.

At that time, Mouna stated that Sofia was her daughter.  Id.  Two

other officers transported Mouna and Sofia to the Revere Police

Department.  Id.  Although Mouna was not formally arrested, she

alleges that she was not free to leave.  Id. ¶ 42.

At the police station, Mouna was interviewed.  Id. ¶ 43.

During this interview and back at the hotel room, Mouna provided

official, certified documentation that she was Sofia's mother.

Id.  She also presented documents supportive of her claim that

Morocco recognized her as Sofia's mother and that the Kandys had

falsified a birth certificate.  Id.  The police copied these

documents.  Id.  Mouna further explained that the Kandys' claims

to custody of Sofia were false, that she had never abandoned her

child or consented to giving up her parental rights, and that no

court had ever determined that Sofia was rightfully in the

physical custody of the Kandys.  Id. ¶ 44.  Moreover, she

repeatedly stated that the documents she presented contained

proof of her parental rights and of the Kandys' falsification of

documents.  Id.

The police officers were aware that the Kandys' passports

would expire within four days and that Sofia would be returning

to Morocco with them.  Id. ¶ 46.  The officers, however, did not

6

request that the Kandys voluntarily surrender their passports. Id. ¶ 47.

Of particular importance with respect to this motion, the plaintiffs allege that the police officers, "in concert with representatives of the Suffolk District Attorney's Office including Michael Murphy, promised Mouna that Sofia would be safely protected in state custody until the conflicting claims of custody could be resolved." Id. ¶ 45. Yet the police defendants "in concert with representatives of the Suffolk district attorney's office including Michael Murphy, made no attempt to protect Sofia but, instead, released her to the custody of the Kandys within minutes of the promises to Mouna that Sofia would be held safely in state custody." Id. ¶ 48. Mouna and Ishaq sought assistance in preventing the Kandys from escaping the country, but they received none from the police or the District Attorney's Office. Id. ¶ 53. As a result, the Kandys immediately fled to Morocco with Sofia. Id. ¶ 49. Mouna has not had custody of her daughter since these events.[2] Id. ¶ 57.

---

[2] Mouna and Ishaq were charged with kidnaping by a relative and kidnaping, respectively, but the charges were dismissed by the Chelsea District Court on August 19, 1998. Am. Compl. ¶¶ 50, 52, 56. The plaintiffs allege that "[i]n an effort to cover up and justify their mistake, the police defendants prepared a false police report which, among other falsehoods, states that Mouna told the police that her parents had adopted Sofia." Id. ¶ 51.

## III. Legal Analysis

### A.    Standard of Review

Dismissal is appropriate "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 [1957]).  In making this determination, the Court should "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff."  Monahan v. Dorchester Counseling Ctr., 961 F.2d 987, 988 (1st Cir. 1992) (citing Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 20 [1st Cir. 1989]).

Nonetheless, the standard for dismissal is not without any bite.  In taking the plaintiffs' allegations as true, the Court may "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets."  Dartmouth Review, 889 F.2d at 16 (internal quotation marks omitted) (quoting Chongris v. Bd. of Appeals, 811 F.2d 36, 37 [1st Cir. 1987]).  Moreover, plaintiffs must set forth in their complaints "'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'"  Id. (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 [1st Cir. 1988]).

8

**B.    Federal Rule of Civil Procedure 8**

The defendants initially contended that the prolix and confusing initial complaint failed to satisfy the basic notice pleading requirements of Rule 8.  Because, however, the Amended Complaint has substantially narrowed the focus of the allegations against Murphy and the District Attorney's Office, the Court holds that the Amended Complaint is sufficient with respect to those defendants.

**C.    Count II:  The Massachusetts Torts Claim Act**

In Count II, Mouna asserts a claim under the Massachusetts Tort Claims Act (the "Act"), Mass. Gen. Laws ch. 258, §§ 1-13, against both Murphy and the District Attorney's Office.  The Act provides that:

> Public employers shall be liable for injury . . .
> caused by the negligent or wrongful act or omission of
> any public employee while acting within the scope of
> his office or employment, in the same manner and to the
> same extent as a private individual under like
> circumstances . . . .  The remedies provided by this
> chapter shall be exclusive of any other civil action or
> proceeding by reason of the same subject matter against
> the public employer or, the public employee or his
> estate whose negligent or wrongful act or omission gave
> rise to such claim, and no such public employee or the
> estate of such public employee shall be liable for any
> injury . . . caused by his negligent or wrongful act or
> omission while acting within the scope of his office or
> employment . . . .  Final judgment in an action brought
> against a public employer under this chapter shall
> constitute a complete bar to any action by a party to
> such judgment against such public employer or public
> employee by reason of the same subject matter.

9

Id. § 2.  The Act serves to abrogate the doctrine of sovereign immunity, but only to the degree provided by the statute.  Thus, the Act provides the exclusive remedy for injuries allegedly caused by the negligent acts or omissions of governmental employees.

### 1.   Exceptions to the Act

The Act contains a number of exceptions, however, in which a public employer retains sovereign immunity.  Id. § 10.  In their motion to dismiss, the defendants point to a series of these exceptions.  Defs.' Mem. at 5-15.  The Court considers each in turn.

### a.   Intentional Tort

The District Attorney's Office contends that Massachusetts General Laws ch. 258, § 10(c) bars the plaintiffs' claims under the Act because they "aris[e] out of an intentional tort," id. at 6, 8.  Section 10(c) provides that the Act shall not apply to "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations."  Mass. Gen. Laws ch. 258, § 10(c); see also Spring v. Geriatric Auth., 394 Mass. 274, 284-86 (1985).

Although the initial complaint could have been read to include claims for false arrest, false imprisonment, malicious prosecution, or malicious abuse of process, the only intentional tort under the Act alleged in the Amended Complaint is arguably intentional infliction of emotional distress.  Am. Compl. ¶ 63 ("The Defendant Michael Murphy acted jointly and in concert with the police defendants to inflict serious emotional distress on the plaintiff Mouna Suboh . . . .").  To the extent that the Amended Complaint alleges intentional infliction of emotional distress, it is dismissed as against the District Attorney's Office.[3]

Mouna's remaining claim under the Act does not arise from an intentional tort.  Id. ¶ 64 ("Murphy acted with recklessness, gross negligence, and ordinary negligence so as to render him and the Office of the District Attorney . . . liable . . . .").  The gravamen of Mouna's complaint under the Act is that, after Murphy promised her that Sofia would remain in state custody until the conflicting claims of custody could be aired, he then permitted Sofia to be released from state custody to the Kandys who foreseeably absconded with Sofia to Morocco.  This claim sounds in negligence.  Murphy had a duty to Mouna to act reasonably,

---

[3] Although the public employer is not held liable under the Act for intentional torts, Murphy, the employee, may still be liable in his personal capacity for the intentional tort.  See infra note 7.

which entailed a duty not to deprive her of custody of Sofia and not to release Sofia into the custody of individuals who would abscond with her.  These duties were allegedly breached because of the defendants' actions.  Murphy's alleged conduct is, without a doubt, a but for cause of the harm to Mouna because, but for his release of Sofia to the Kandys, the Kandys would not have been able to abscond with her to Morocco.  Although these factual circumstances do not fit neatly into any doctrinal box, they fit best within the contours of common law negligence.  As such, the remaining claim under the Act is not barred by section 10(c).

### b.  Discretionary Function

Murphy and his office also contend that they are immune from liability under the Act because the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." Mass. Gen. Laws ch. 258, § 10(b), cited in Defs.' Mem. at 6. Mouna responds, however, that the "discretionary function defense is limited to decisions concerning the establishment of general policies and procedures, rather than the decision whether or not to follow an established procedure or legal duty."  Pls.' Opp'n at 8.  Case law supports Mouna's position.

12

The Massachusetts Supreme Judicial Court encountered this exemption in a similar factual situation in <u>A.L.</u> v. <u>Commonwealth</u>, 402 Mass. 234 (1988).  In <u>A.L.</u>, the plaintiffs brought suit against a probation officer after they were sexually molested by a probationer under the officer's charge.  <u>Id.</u> at 236.  Although the sentencing judge had ordered that the probationer refrain from teaching and associating with young boys, the probation officer failed to verify the probationer's place of employment, which turned out to be a middle school in East Boston.  <u>Id.</u> at 236-37.  In response to the plaintiffs' claim of negligence against the Commonwealth for the nonfeasance of the probation officer, the Commonwealth argued that section 10(b) exempts it from liability under the Act because the probation officer's monitoring of the probationer's compliance with the court's order was a discretionary function.  <u>Id.</u> at 245.  The Supreme Judicial Court explained:

> [G]overnment officials are immune from suit, "[w]hen the particular conduct which caused the injury is one characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning . . . ."  By contrast, we impose governmental liability "when the particular conduct claimed to be tortious in- volves . . . the carrying out of previously established policies or plans."

<u>Id.</u> (quoting <u>Whitney</u> v. <u>Worcester</u>, 373 Mass. 208, 218 [1977]). Thus, the court identified public policy and planning as the key

13

ingredients to the discretionary function defense.   After

recognizing that the sentencing judge (and not the probation

officer) truly applied various public policies when drafting the

terms of probation, the court determined that the officer's

failure to verify the probationer's employment was not a

discretionary function.   Id. at 245-46.

     In Harry Stoller & Co. v. City of Lowell, 412 Mass. 139

(1992), the Supreme Judicial Court reaffirmed this distinction

between conduct in the nature of forming or creating public

policy, and conduct more consistent with executing or applying a

stated public policy.   The Supreme Judicial Court explained:

> Almost all conduct involves some discretion, if only
> concerning minor details.   If allegedly tortious
> conduct were to be immunized from causing liability
> simply because there was some element of discretion in
> that conduct, the discretionary function exception
> would go a long way toward restoring the governmental
> immunity that [the Act] was designed to eliminate.   As
> we shall show, however, the discretionary function
> exception . . . is far narrower, providing immunity
> only for discretionary conduct that involves
> policymaking or planning.   Because of the limitation of
> the exemption to conduct that is policymaking or
> planning, the words "discretionary function" are
> somewhat misleading as a name of the concept.

Id. at 141.   The Supreme Judicial Court also examined the

opinions of the United States Supreme Court concerning the

discretionary function exception under the Federal Tort Claims

Act, and concluded that the "important lesson from the opinions

of the Supreme Court is that governmental immunity does not

14

result automatically just because the governmental actor had discretion.  Discretionary actions and decisions that warrant immunity must be based on considerations of public policy."  Id. at 143.  In light of these and other pronouncements from the highest court capable of speaking authoritatively on this issue, it is clear that only conduct based upon a policy or planning judgment comes within the purview of the discretionary function exception.

The District Attorney's Office argues that Murphy used discretion because he could have chosen any of a number of courses of action with respect to Sofia, including releasing her into the custody of Mouna, Mouna's parents, or the Department of Social Services.[4]  Even if this decision rises to the level of public policy determinations required under section 10(c), the discretionary function exception still would not apply because this decision was not within Murphy's discretion.  Under Massachusetts law, the determination of child custody is in the hands of the judiciary, and notice and a hearing are required before custody can be altered.  Mass. Gen. Laws ch. 201, § 5.

---

[4] The District Attorney's Office also argues that decisions regarding prosecutions fall under the section 10(b) exception. The Amended Complaint, however, no longer bases the District Attorney's Office's liability under the Act on Murphy's actions related to prosecuting Mouna.  The actions of Murphy that give rise to Mouna's claim under the Act were not within his prosecutorial discretion.  See infra Section III.D.1.

The fact that Sofia was in the temporary custody of the state does not alter this requirement because any emergency change of custody must be followed promptly by a hearing.  Here, turning Sofia over to the Kandys frustrated any possibility that Mouna would receive such a hearing because the Kandys foreseeably absconded with Sofia.  Because Murphy lacked authority to make this custody determination, his claim to protection under section 10(b) is destroyed.  Harry Stoller, 412 Mass. at 141 ("[I]f the governmental actor had no discretion because a course of action was prescribed by a statute, regulation, or established agency practice, a discretionary function exception to governmental liability has no role to play in deciding the case.").

### c.   Statutory Public Duty Rule

Murphy and his office also seek protection from section 10(j), the statutory version of the common law's public duty rule.  Mass. Gen. Laws ch. 258, § 10(j), cited in Defs.' Mem. at 10-14.  Section 10(j) provides, in relevant part, that section 2 shall not apply to

> any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.

Id.  The defendants argue that the "alleged harm that befell each of the [p]laintiffs was caused by the allegedly tortious conduct

16

of a third party, the Kandys, acting on their own." Defs.' Mem.
at 10.

Massachusetts courts have repeatedly applied this exemption
when a plaintiff suffers harm at least in part due to the failure
of a public employee to perform some service, where the employee
had only a general duty to perform for the benefit of the public,
rather than for the benefit of some specific individual. E.g.,
Brum v. Town of Dartmouth, 428 Mass. 684, 691-96 (1999) (ruling
that school officials could not be held liable for a student's
death, which may have been due in part to the school's failure to
adopt security policies); Bonnie W. v. Commonwealth, 419 Mass.
122, 126 (1994) (barring claim against public employer where
parole officer's failure to supervise a parolee properly may have
led to plaintiff's sexual assault by the parolee); Jean W. v.
Commonwealth, 414 Mass. 496, 499 (1993) (announcing the court's
intention to abolish the common law public duty rule, which
precipitated the 1994 enactment of section 10[j]); Ford v. Town
of Grafton, 44 Mass. App. Ct. 715, 724-25 (1998); J.K. v.
Commonwealth, 28 Mass. App. Ct. 761, 766-68 (1990).

On its face, section 10(j) does not apply to the facts of
this case. Section 10(j) excludes from its scope claims based on
the "failure to act to prevent or diminish the harmful
consequences of a condition" where the harmful consequences were

17

"not originally caused by the public employer."  Mass. Gen. Laws ch. 258, § 10(j).  Here, when Murphy permitted Sofia to be released into the hands of the abducting Kandys, he created the very condition that occasioned the harmful consequence.  The harm complained of -- a mother's separation from her child -- occurred at the moment Murphy released custody of Sofia to the Kandys; the harm was only further exacerbated by the Kandys' subsequent flight to Morocco.  As a result, although not argued in Mouna's brief, the Court holds that Murphy's conduct "originally caused" the condition or situation giving rise to the harmful consequences, making section 10(j) inapplicable.

Even if the Court were to assume that section 10(j) applies to Mouna's claim, however, she also falls under the two statutory exceptions to section 10(j), thus defeating the District Attorney's Office's reliance on section 10(j).  Mass. Gen. Laws ch. 258, § 10(j)(1), (2).  The Act provides that the section 10(j) exclusion does not apply to:

> (1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. . . .
> (2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention . . . .

18

Id.

     With respect to section 10(j)(1), the parties dispute
whether the assurances of assistance were "explicit" and
"specific."  In <u>Lawrence</u> v. <u>City of Cambridge</u>, 422 Mass. 406
(1996), the Supreme Judicial Court examined this statutory
provision and explained:

> Neither "explicit" nor "specific" is defined in the
> statute.  We interpret the words in accordance with
> their plain meaning.  Although the meanings of these
> terms are similar, we believe that by "explicit" the
> Legislature meant a spoken or written assurance, not
> one implied from the conduct of the parties or the
> situation, and by "specific" the terms of the assurance
> must be definite, fixed, and free from ambiguity.

<u>Id.</u> at 410 (citations omitted).  In light of these definitions,
Mouna has sufficiently alleged an explicit and specific assurance
of assistance made by a public employee.  She alleges that she
was told that Sofia would remain in state custody pending
resolution of the dispute.  Because the assurance was spoken, it
cannot be doubted that it was explicit and not implied from the
conduct of the parties or the situation.  Likewise, the alleged
assurance was "definite, fixed, and free from ambiguity."  <u>Id.</u>
Murphy sufficiently defined the course of action that he
apparently intended to follow, i.e., to retain Sofia in state
custody.  This course of action also had a fixed (although at
that time unknown) duration, i.e., until resolution of the
custody dispute.  And, as alleged, the promise was not open to

various conflicting interpretations. "We will take custody of Sofia until all of this is sorted out," is not ambiguous, and it does not encompass an immediate decision to turn custody over to Sofia's absconders. Thus, the Court holds that the exception under 10(j)(1) is sufficient to extinguish the District Attorney's Office's claim to protection under section 10(j).[5]

Mouna also points to section 10(j)(2), which excepts from the operation of the section 10(j) exemption "any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention." Mass. Gen. Laws ch. 258, § 10(j)(2). This exception mirrors the common law exception to the general rule of immunity from tort liability for one's omissions where the defendant, although he could have avoided liability by choosing to neglect the victim altogether, instead opted to intervene, and such intervention placed the victim in a

---

[5] Although not argued in the briefs, the issue of reliance could arguably derail Mouna's dependence on section 10(j)(1). Section 10(j)(1) requires that "the injury result[] in part from reliance on those assurances." Mass. Gen. Laws ch. 258, § 10(j)(1). It could be argued that Mouna did not rely to her detriment on Murphy's assurances because the harm would have occurred whether or not Mouna thought Murphy was going to keep Sofia away from the Kandys. At least at the motion to dismiss stage, however, the Court must infer that Mouna would have taken further steps to prevent Murphy from turning over custody had she known of his intent to do so, including making further allegations of legal custody or demanding that the Department of Social Services be called into the matter.

worse position than he was in prior to the intervention.  Here,
the plaintiffs contend that Murphy's transfer of custody from the
state to the Kandys placed Sofia in a worse position than she was
in before the intervention and directly caused injury to Sofia.
Pls.' Opp'n at 12.  Although the argument specifically refers
only to harm to Sofia, Mouna was similarly placed in a worse
position by Murphy's actions.  A familial relationship is
reciprocal.  Before Murphy acted, Sofia was safely in state
custody and Mouna would have had the opportunity to a hearing to
determine custody.  After Sofia was placed in the custody of her
grandparents, Mouna's hope to maintain her relationship with her
child was lost.  Thus, Mouna's claim fits within the section
10(j)(2) exception to the statutory public duty rule.

### d.    Release from Custody

Finally, the District Attorney's Office calls upon section
10(i) to avoid liability under the Act.  Defs.' Mem. at 14-15.
In response, Mouna argues that to apply section 10(i) to this
case would turn the Act on its head.  Indeed, Mouna's
characterization of the District Attorney's Office's argument is
correct in light of the scope of the section 10(i) exemption.

Section 10(i) of the Act provides that section 2 shall not
apply to "an[y] claim based upon the release, parole, furlough or
escape of any person, including but not limited to a prisoner,

21

inmate, detainee, juvenile, patient or client, from the custody of a public employee or employer or their agents, unless gross negligence is shown in allowing such release, parole, furlough or escape." Mass. Gen. Laws ch. 258, § 10(i). The District Attorney's Office argues that by its terms, this exemption applies to Mouna's claim because her claim is based upon Murphy's release of Sofia from state custody. This, however, was not the intended scope of the exception. Although Sofia's release might literally fall under the terms of section 10(i), this section was intended to apply to a situation in which a person in state custody is released by a state actor and then causes harm to some third person, who brings an action alleging improper release. Joseph W. Glannon, Liability for "Public Duties" Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 Mass. L. Rev. 17, 19, 24-25, 30 (1994). Unlike the situation in which a released individual causes harm,

> [h]ere it is the very act of release itself that
> constituted the harm, not some later act that could
> have been proximately caused by that release . . . .
> The wrong in this conduct became manifest at the moment
> of release, not necessarily only after Sofia left this
> country. That harm -- the coerced separation of a
> child from her mother -- was not caused by third
> parties. It was caused by the defendants themselves.

Pls.' Opp'n at 9-10. Consequently, the Court will not dismiss Mouna's negligence claim on the grounds of section 10(i).

22

Moreover, even if this Court did consider section 10(i) to be applicable, dismissal would still be inappropriate because Mouna has alleged gross negligence on the part of the District Attorney's Office in releasing Sofia. The statute does not immunize a public employer where gross negligence[6] is shown in allowing such release. Mass. Gen. Laws. ch. 258, § 10(i). Disputes regarding the degree of negligence are within the province of the jury. Plainly speaking, a reasonable jury could conclude that the release of a six-year-old child to her former kidnapers, whose passports are just days from expiring, despite a promise to the child's mother that she would be protected, rises to the level of "gross negligence."

Consequently, the Court denies the motion to dismiss Count II with respect to Mouna's negligence claim against the District Attorney's Office.

---

[6] The Massachusetts Appeals Court recently defined gross negligence as "a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. . . . It falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong." Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 20 & n.4 (1997) (internal quotation marks omitted) (quoting Altman v. Aronson, 231 Mass. 588, 591-92 [1919]). Gross negligence includes "indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected . . . . a heedless and palpable violation of legal duty respecting the rights of others." Altman, 231 Mass. at 591.

### 2. Who is Liable: The District Attorney's Office or Murphy?

The Act, relying upon the theory of respondeat superior, charges liability to the public employer for the negligent acts of its employees. In so doing, however, the Act makes this remedy the exclusive remedy for the negligence of the public employee. Mass. Gen. Laws ch. 258, § 2 ("[N]o such public employee . . . shall be liable for any injury . . . caused by his negligent or wrongful act or omission while acting within the scope of his office or employment . . . ."). As Professor Glannon has explained:

> At common law, municipalities were immune from suit on most claims, while their employees could frequently be sued. The [Act] reverses that scheme: section 2 provides that the public employer may be sued for negligence of public employees, while the employee is not personally liable, so long as she cooperates in the defense of the action.

Joseph W. Glannon, The Massachusetts Tort Claims Act: Analysis and Update, 75 Mass. L. Rev. 52, 58 (1990) (citations omitted). Because the Act entitles Mouna to sue the District Attorney's Office for Murphy's negligence, Mouna cannot also maintain a negligence claim under the Act against Murphy. Therefore, the Court grants the motion to dismiss Count II with respect to Mouna's claim against Murphy.[7]

---

[7] By the Act's design, however, if no negligence action lies against the District Attorney's Office under the Act, then an action could still lie against Murphy in his individual capacity.

24

### D.   Counts IV & X: Section 1983

In Counts IV and X, Mouna and Sofia, respectively, premise liability against Murphy in his individual capacity under 42 U.S.C. § 1983.[8]  In response to these claims, Murphy argues that absolute or qualified immunity applies.  The Court considers each argument in turn.

### 1.  Absolute Immunity

A state prosecutor has absolute immunity from suit under civil rights laws for the initiation and pursuit of a criminal

---

Mellinger v. Town of W. Springfield, 401 Mass. 188, 196 (1987) (holding that a town cannot be held liable for the intentional torts of its police officers, but nonetheless explaining that the officers "are amenable to this intentional tort claim in their individual capacities"); Spring, 394 Mass. at 286 n.9 ("While public employers . . . may not be held liable for intentional torts committed by their employees [under the Act], the employees may be personally liable for any harm they have caused.").  Under such circumstances, a motion for reconsideration might be appropriate.

[8] The defendants contend in their memorandum that because the original complaint should be construed as bringing claims against them in their official capacities as representatives of the Commonwealth, the suit is barred by the Eleventh Amendment and is not cognizable under section 1983.  Defs.' Mem. at 15-19 (citing Hafer v. Melo, 502 U.S. 21, 26 [1991]; Will v. Mich. Dep't of State Police, 491 U.S. 58, 64-65 [1989]; Papasan v. Allain, 478 U.S. 265, 276 [1986]; Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100-01 [1984]).  This contention has been rendered moot by the plaintiffs' Amended Complaint, which clarifies that the two section 1983 claims against Murphy have been brought against him in his individual, not official, capacity.  Pls.' Opp'n at 4 ("The amended complaint clarifies Mouna Suboh's claims against Assistant [District] Attorney Michael Murphy so that he is named in the § 1983 counts individually.").

prosecution, as well as for her actions during judicial proceedings.  Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) (citing Imbler v. Pachtman, 424 U.S. 409, 430 [1976]).  The reasoning behind the doctrine is clear.  Absolute prosecutorial immunity is intended to protect the prosecutor's independence as she makes difficult determinations regarding matters within her discretion.  When a prosecutor is enshrouded in absolute immunity, the protection is not eroded no matter how erroneous the act may have been, how injurious its consequences, or how malicious the motive.  Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985); Cok v. Cosentino, 876 F.2d 1, 2 (1st Cir. 1989) (per curiam).  In determining the applicability of absolute immunity, the Court looks to the "nature of the function performed" rather than the propriety of a given prosecutorial decision.  Forrester v. White, 484 U.S. 219, 229 (1988); see also Burns v. Reed, 500 U.S. 478, 486 (1990).  Once that function is identified, immunity is available "only when the official is performing functions that require the exercise of prosecutorial discretion. . . .  [I]t is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance."  Kalina v. Fletcher, 522 U.S. 118, 125 (1997) (emphasis added).

To the extent that Mouna's and Sofia's original complaint reached conduct involving Murphy's decision to prosecute Mouna and Ishaq for kidnaping, such claims would have been precluded by absolute immunity. Buckley, 509 U.S. at 272-73. The Amended Complaint makes clear, however, that Mouna and Sofia do not rely on these factual allegations as the basis for their section 1983 claims. Instead, the deprivation of which they complain is wholly unrelated to any prosecutorial functions such as the initiation, preparation, or performance of judicial proceedings. Murphy's alleged conduct was akin to making a custody determination, which is a function of the courts (and arguably the Department of Social Services), but not a prosecutor. Such decisions are far outside prosecutorial authority, discretion, and expertise. Robison v. Via, 821 F.2d 913, 918-19 (2d Cir. 1987) (refusing to grant absolute immunity to prosecutor's participation in seizure of children from parental custody); see also Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995) ("Absolute immunity protects the prosecutor's 'role as advocate for the State,' and not his or her role as an 'administrator or investigative officer.'" [internal quotation marks omitted] [quoting Burns, 500 U.S. at 491]). Consequently, Murphy's motion to dismiss Counts IV and X on the grounds of absolute immunity is denied.

## 2.   Qualified Immunity

Murphy also asserts the typical twin of absolute immunity:

qualified immunity.  "[G]overnment officials performing

discretionary functions generally are shielded [by qualified

immunity] from liability for civil damages insofar as their

conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also

Souza v. Pina, 53 F.3d 423, 425 (1st Cir. 1995).  "[O]fficials

can act without fear of harassing litigation only if they

reasonably can anticipate when their conduct may give rise to

liability for damages . . . ."  Borucki v. Ryan, 827 F.2d 836,

837 (1st Cir. 1987) (internal quotation marks omitted) (quoting

Davis v. Scherer, 468 U.S. 183, 195 [1984]).  The First Circuit

recently addressed the matter of qualified immunity:

> The classic question that a qualified immunity defense
> poses is whether the allegedly violated federal right
> was established with sufficient clarity that a
> reasonable government functionary should have conformed
> his conduct accordingly.  In answering this question, a
> court must undertake an objective inquiry into the
> totality of the circumstances, with a view toward
> ascertaining whether the right allegedly infringed,
> articulated at an appropriate level of generality, was
> settled at the time of the public official's actions,
> and if so, whether the official's conduct was obviously
> inconsistent with that right.  In the last analysis,
> then, qualified immunity proposes to protect government
> functionaries who could not reasonably have predicted
> that their actions would abridge the rights of others,

even though, at the end of the day, those officials may
have engaged in rights-violating conduct.

Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999)

(citations omitted); accord Frazier v. Bailey, 957 F.2d 920, 929

(1st Cir. 1992) ("Harlow requires that we examine two issues:

[1] whether at the time of the alleged conduct there was a

clearly established constitutional right that was violated; and

[2] whether a reasonable person would have known that her conduct

violated that constitutional right.").  To find a clearly

established right, "[t]he contours of the right must be

sufficiently clear that a reasonable official would understand

that what he is doing violates that right."  Anderson v.

Creighton, 483 U.S. 635, 640 (1987).  It is not necessary that

the particular right at issue have previously been held unlawful,

but it is necessary that "in the light of pre-existing law the

unlawfulness must be apparent."  Id.

### 3.    The Plaintiffs' Fourteenth Amendment Rights

Given the above pronouncements on absolute and qualified

immunity, the Court now turns to the claims in this case.  The

Fourteenth Amendment protects both substantive and procedural due

process.  Washington v. Glucksberg, 521 U.S. 702, 719-20 (1997).

### a.    Substantive Due Process

The facts alleged in the Amended Complaint give rise to two

violations of Mouna's and Sofia's clearly established substantive

29

due process rights: (1) the right to familial integrity and (2) the right not to have the state release a child in its custody to a known dangerous individual.  The first right was violated by Mouna's de facto deprivation of physical custody of Sofia without any evidence of parental unfitness; the second right was violated by the state's release of Sofia to the Kandys.  The Court discusses each in turn.

### (1)  Right to Familial Integrity

The interests of parents in the care, custody, and control of their children is a fundamental right protected by the Constitution.  Troxel v. Granville, 530 U.S. 57, 66 (2000) ("In light of . . . extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.")[9] (citing Meyer v. Nebraska, 262 U.S. 390 [1923]; Pierce v. Soc'y of Sisters, 268 U.S. 510 [1925]; Prince v. Massachusetts, 321 U.S. 158 [1944]; Stanley v. Illinois, 405 U.S. 645 [1972]; Wisconsin v. Yoder, 406 U.S. 205 [1972]; Quilloin v. Walcott, 434 U.S. 246 [1978]; Parham v. J.R., 442 U.S. 584 [1979]; Santosky v. Kramer, 455 U.S. 745

---

[9] The Court recognizes that the relevant question is what law was clearly established as of 1998, the time Murphy acted. Anderson, 483 U.S. at 639.  Reliance on Troxel is entirely appropriate, however, to the extent that it is based wholly on Supreme Court precedent from well before 1998.

[1982]; <u>Washington</u> v. <u>Glucksberg</u>, 521 U.S. 702 [1997]).  The
substantive due process right of a child to be raised and
nurtured by her parents is equally fundamental.  <u>See</u> <u>Santosky</u>,
455 U.S. at 760 & n.11.

In light of its unclear boundaries and qualified nature,
however, courts have been hesitant to hold that the abstract
right to familial integrity is clearly established for the
purposes of qualified immunity in the absence of compelling
facts.  Along this line, in <u>Frazier</u> v. <u>Bailey</u>, 957 F.2d 920 (1st
Cir. 1992), the First Circuit held that the abstract fundamental
right to familial integrity is insufficiently clear to put
defendants on notice that their conduct was unlawful:

> [W]hile there may be a due process right of "familial
> integrity" of some dimensions, the dimensions of this
> right have yet to be clearly established.  Moreover, to
> the extent it is well-defined, the liberty interest is
> not absolute but rather balanced against the govern-
> mental interest.  In such circumstances we find that
> [the plaintiff] has failed to show that the steps taken
> by [the defendants] in responding to the allegations of
> sexual abuse "violated the nebulous right of family
> integrity."  Because the right to family integrity has
> not been so particularized as to put defendants on
> notice that their conduct was unlawful, [the defend-
> ants] are entitled to qualified immunity as a matter of
> law.

<u>Id.</u> at 931 (citations omitted).

The Court could read <u>Frazier</u> broadly to hold that the right
to familial integrity is simply too amorphous to surmount the
hurdle of qualified immunity under any circumstances.  This Court

refuses, however, to afford the bedrock right of familial integrity such blanket treatment.  The applicability of qualified immunity to the right of familial integrity should instead be considered in light of the totality of the circumstances:

> [C]ases claiming governmental interference with the right of family integrity are properly analyzed by placing them, on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy. When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity.  However, when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

Brokaw v. Mercer County, 235 F.3d 1000, 1023 (7th Cir. 2000) (quoting Morris v. Dearborne, 181 F.3d 657, 671 [5th Cir. 1999]). Although the outer limits of the right to familial integrity may be blurred, the right has a core, violation of which is in violation of clearly established law.  Strail v. Dep't of Children, Youth, & Families, 62 F. Supp. 2d 519, 532 (D.R.I. 1999).

To see that this case lies at the core of the right to familial integrity, it is necessary to compare the facts of this case to the factual scenario in Frazier.  Frazier, as well as the

32

cases upon which it relied,[10] involved a common, but inapposite

factual scenario.  In <u>Frazier</u>, the state involvement centered

around an investigation into child abuse and the resulting

temporary deprivation of custody based on that investigation.

<u>Frazier</u>, 957 F.2d at 929.  In such circumstances, the parent's

right to familial integrity competes with the governmental

interest in the welfare of the child and is only temporarily

disturbed.  <u>Id.</u> at 929-30.

This case differs in two important respects: (1) the

government interest in releasing Sofia to the Kandys was nil[11]

and (2) the intrusion into Mouna's and Sofia's right to familial

integrity was permanent.

---

[10] <u>Landstrom</u> v. <u>Ill. Dep't of Children & Family Servs.</u>, 892
F.2d 670 (7th Cir. 1990); <u>Baker</u> v. <u>Racansky</u>, 887 F.2d 183 (9th
Cir. 1989); <u>Hodorowski</u> v. <u>Ray</u>, 844 F.2d 1210 (5th Cir. 1988);
<u>Myers</u> v. <u>Morris</u>, 810 F.2d 1437 (8th Cir. 1987).

[11] Other courts have recognized that the lack of a competing
government interest is sufficient to make the right to familial
integrity clearly established.  For example, in <u>Brokaw</u>, the
court, recognizing that the right to familial integrity was not
absolute, nonetheless held that "[i]n balancing these competing
interests, courts have recognized that a state has no interest
in protecting children from their parents unless it has some
definite and articulable evidence giving rise to a reasonable
suspicion that a child has been abused or is in imminent danger
of abuse."  <u>Brokaw</u>, 235 F.3d at 1019.  Similarly, in <u>Strail</u>, the
court held that the qualified immunity defense failed to justify
summary judgment because no facts suggested that the child was in
need of protection.  <u>Strail</u>, 62 F. Supp. 2d at 532.  Under such
circumstances, the issue of qualified immunity did not require a
complex balancing test -- there simply was no state interest.
<u>Id.</u>

First, taking the allegations of the complaint as true, any balancing of the child's, parent's, and government's interests clearly points to Murphy's action being in violation of Mouna's and Sofia's right to familial integrity.  The plaintiffs assert that: (1) it was undisputed that Mouna had legal custody of Sofia, Am. Compl. ¶¶ 43-44; (2) the Kandys retained custody of Sofia illegally, id. ¶ 44; (3) there was no evidence of any abuse or neglect by Mouna,[12] id.; (4) there was evidence that the Kandys would leave the country with Sofia, in essence, kidnap her, id. ¶ 46; and (5) Sofia was already in state custody and there was no reason not to continue state custody -- in fact, there was strong reason to not release her to the Kandys, who would foreseeably abscond with her, id. ¶¶ 45-49.  The mere fact that a dispute as to Sofia's custody existed did not create a

---

[12] Although it is true that there were allegations that Mouna kidnaped Sofia -- allegations which could have triggered the state's interest in protecting the child -- one must consider this in conjunction with the fact that Murphy released Sophia into the custody of the Kandys, who were also alleged to have custody of Sofia illegally.  Murphy wants to have his cake and eat it too by suggesting that his actions were reasonably within the bounds of the law because of the uncertainty of Mouna's legal entitlement to custody, but in so doing he ignores the fact that he handed Sofia over to even more questionable custodians.  Even if the state had an interest in not giving custody to Mouna (which is itself questionable in light of Mouna's allegations that she presented proof of her legal custody), that same interest should have made it apparent to Murphy that the Kandys should also not get custody.  Sofia was already in state custody and nothing prevented Murphy from continuing state custody until a judge could properly determine custody.

government interest in turning Sofia over to the Kandys in light

of these facts.  Thus, Murphy's hasty determination of the

custody dispute violated Mouna's and Sofia's right to familial

integrity because there was no government interest in turning

Sofia over to the Kandys.[13]

---

[13] Other courts have similarly held that hasty custody
determinations made with no basis of parental unfitness clearly
violate the right to familial integrity.  In Truelove v. Hunt,
67 F. Supp. 2d 569 (D.S.C. 1999), the defendants entered the
plaintiffs' home and gave the child to another person based upon
a patently false and forged custody order, id. at 577.  The court
concluded that the law on this point was "manifestly clear" that
a parent has a "right to be free from law enforcement officers
removing her child from her custody based upon a patently false
and forged family court custody order and giving that child to
the forging parent."  Id. at 580.  The court reasoned that there
was no legitimate governmental interest because the only reason
that the child was removed was the patently false custody order.
Id.

Moreover, in Wooley v. Baton Rouge, 211 F.3d 913 (5th Cir.
2000), the Fifth Circuit was presented with a case in which an
officer was confronted by two conflicting custody orders, id. at
917-18.  The officer, deciding that immediate action was neces-
sary, awarded custody based on the order bearing the later date.
Id.  Although the court recognized that because of the competing
interests involved in the right to familial integrity there were
some instances in which the right was not clearly established,
the court did not think that the facts presented such a
situation:

Our cases in which the state's interest has blurred the
existence of a family's rights uniformly have involved
removal of children by social workers specifically
charged with protecting children where there were
allegations of abuse.  There is no indication in this
record of any threat to Jordan's safety, nor were the
officers investigating allegations that he previously
had suffered abuse at the hands of [his mother]. . . .
Under the circumstances, [the plaintiffs] enjoyed a
clearly established right to maintain their relation-

35

Second, Murphy, by releasing Sofia into the custody of the
Kandys, who he should have known would shortly leave the country
because of their soon to expire passports, effected a permanent
termination of Mouna's physical custody of her daughter.   The
alleged facts suggest that: (1) Murphy had sufficient evidence to
know that the Kandys had previously had custody of Sofia
illegally,  Am Compl. ¶¶ 43-45; and (2) Murphy had sufficient
information to know that, if Sofia were released to the Kandys,
then the Kandys would abscond with her, id. ¶¶ 46-47, 49.
Murphy's release of Sofia to the Kandys under these circumstances
was a foreseeable, permanent deprivation of a mother's physical
custody of her child.   This lies at the core of the right to
familial integrity.  Cf. Pittsley v. Warish, 927 F.2d 3, 8 (1st
Cir. 1991) (noting state action that leads to a permanent
deprivation of custody is more egregious than state action that
affects the parental relationship only incidentally).

Frazier's holding is inapplicable to the facts of this case.
In light of the compelling facts presented in the Amended
Complaint, the Court concludes that Mouna's and Sofia's right to
familial integrity was clearly established and that a reasonable

---

ship free from interference by state actors.

Id. at 924 (citations omitted).

person in Murphy's position would have known that his release of
Sofia into the Kandys' custody violated that right.

### (2)   Right Not to Be Released to Dangerous Individuals

The state's release of Sofia to the Kandys after the state
had taken custody of her violated the substantive due process
right of a parent and her child not to have a child in state
custody turned over to someone whom the state knows, or should
know, to be dangerous.  This right is clearly established by
Supreme Court precedent.[14]

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court
held that the Eighth Amendment's prohibition against cruel and
unusual punishment prohibits the state from being deliberately
indifferent to the medical needs of its prisoners, id. at 103-04.
The Court reasoned that, because the prisoner could not care for
himself as long as he was in the custody of the state, it was
necessary that the state assume this responsibility.  Id.  In
Youngberg v. Romeo, 457 U.S. 307 (1982), the Supreme Court
extended this reasoning to the Fourteenth Amendment's substantive
due process protections, holding that the state is required to
provide involuntarily committed mental patients with services

---

[14] Although no court has applied this right to the facts of
a case such as this one, it is not necessary that the specific
factual scenario of this case be decided in a previous case for
Murphy's actions to have been in violation of clearly established
law.

37

necessary for their reasonable safety and care, id. at 324. See also City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."). In DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989), the Supreme Court explained that "[t]aken together, [these cases] stand . . . for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being," id. at 199-200.[15]

Supreme Court precedent alone seems sufficient to hold that it is clearly established that the state violates the Constitution when it gives a child in custody to a person that the state should know to be dangerous, because once the state takes custody of a child, it has an affirmative duty to ensure the safety of the child. But Murphy also had the benefit of law

---

[15] Although, in DeShaney, the Supreme Court held that the state did not have an affirmative duty to protect a child in her parent's custody, DeShaney, 489 U.S. at 201, it hinted that had the state possessed custody of the child, then the result would have been different. "Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect," id. at 201 n.9.

from several circuits that have <u>explicitly</u> extended <u>Estelle</u>,

<u>Youngberg</u>, and <u>DeShaney</u> to the context of a state's release of

children to foster parents known to be or suspected to be

dangerous.  <u>Yvonne L.</u> v. <u>N.M. Dep't of Human Servs.</u>, 959 F.2d

883, 892-93 (10th Cir. 1992); <u>K.H.</u> v. <u>Morgan</u>, 914 F.2d 846, 853

(7th Cir. 1990); <u>Meador</u> v. <u>Cabinet for Human Res.</u>, 902 F.2d 474,

476 (6th Cir. 1990); <u>Taylor</u> v. <u>Ledbetter</u>, 818 F.2d 791, 797 (11th

Cir. 1987); <u>Doe</u> v. <u>N.Y. City Dep't of Social Servs.</u>, 649 F.2d

134, 141 (2d Cir. 1981); <u>see also</u> <u>Norfleet</u> v. <u>Ark. Dep't of Human</u>

<u>Servs.</u>, 989 F.2d 289, 293 (8th Cir. 1993) (holding that child in

foster care had the right to adequate medical care).

Supreme Court and circuit court case law clearly establishes

that once the state takes custody of a child, the state has an

affirmative duty to look after her safety by not releasing her to

someone suspected of being dangerous.  Under the facts of this

case, a reasonable person should have known that releasing Sofia

into the custody of the Kandys was in violation of that right,

because the state should have known that the Kandys would

immediately abscond with her.[16]  It would be naive to think that

---

[16] The fact that Sofia was turned over to a relative does
not alter this right.  First, even though the Kandys were rela-
tives, Murphy should have known that they would abduct Sofia.
Second, there was no risk of disturbing the Kandys' right to
familial integrity by continuing state custody because Mouna had
shown that they had custody of Sofia illegally.  Any suggestion
made in <u>Doe</u> v. <u>Bobbitt</u>, 881 F.2d 510, 511-12 (7th Cir. 1989) that
turning over a child to a relative does not affect substantive

the Kandys should not have been suspected of being dangerous.
Murphy had sufficient information to know that the Kandys would
abduct Sofia.  Even if kidnapers do not physically abuse their
victims, kidnaping is a very serious crime under both state,
Mass. Gen. Laws ch. 265, § 26, and federal, 18 U.S.C. § 1201,[17]
law.  Murphy released Sofia to suspected kidnapers.  A reasonable
person would know that this course of action was inconsistent
with her safety.

### b.    Procedural Due Process

The previous discussion makes clear that parents and their
children have a liberty interest in parental custody.  Thus, any
deprivation of custody must be accomplished via procedurally
adequate and constitutional means.

It is clearly established that a parent cannot be deprived
of custody of a child absent notice and a hearing unless there
are exigent circumstances of abuse or neglect.  Stanley v.
Illinois, 405 U.S. 645, 650-57 (1972); Malik v. Arapahoe County
Dep't of Social Servs., 191 F.3d 1306, 1315 (10th Cir. 1999); Ram
v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997); Doe v. Moffat, 116

---

rights was severely limited in Camp v. Gregory, 67 F.3d 1286,
1294-95 (7th Cir. 1995).

[17] Moreover, Congress has recently taken steps to prevent
even parental kidnaping.  See 28 U.S.C. § 1738A ("Full faith and
credit given to child custody determinations"), amended by Pub.
L. No. 106-386, 114 Stat. 1464 ("Safe Havens for Children Pilot
Program").

F.3d 464, No. 96-2351, 1997 WL 313971, at *1 (1st Cir. June 11,
1997) (unpublished table decision)[18] (quoting Robison, 821 F.2d
at 922); Martinez v. Mafchir, 35 F.3d 1486, 1491 (10th Cir.
1994). Even in such emergency situations, however, an adequate
post-deprivation hearing must occur within a reasonable time.
Campbell v. Burt, 141 F.3d 927, 929 (9th Cir. 1998); Hooks v.
Hooks, 771 F.2d 935, 942 (6th Cir. 1985); Duchesne v. Sugarman,
566 F.2d 817, 826 (2d Cir. 1977).

Murphy's turning over custody of Sofia to the Kandys
violated Mouna's and Sofia's right to procedural due process by
effecting a de facto permanent deprivation of physical custody
without any hearing at all. Rather than conducting the required
timely post-deprivation custody hearing, Murphy released custody
of Sofia to the Kandys with sufficient information to have known
that they would abscond with her to Morocco. Because it was
apparent that the Kandys would kidnap Sofia, Murphy's turning her
over to them deprived Mouna and Sofia of a post-deprivation
hearing altogether. Hooks, 771 F.2d at 942 (recognizing that
turning child over to someone who will abscond with the child

---

[18] For the propriety of citing unpublished decisions, see
Anastasoff v. United States, 223 F.3d 898, 899-905 (8th Cir.) (R.
Arnold, J.) (holding that unpublished opinions have precedential
effect), vacated as moot, No. 99-3917, 2000 WL 1863092 (8th Cir.
Dec. 18, 2000), Giese v. Pierce Chem. Co., 43 F. Supp. 2d 98, 103
(D. Mass. 1999) (relying on unpublished opinions' persuasive
authority), and Richard S. Arnold, Unpublished Opinions: A
Comment, 1 J. App. Prac. & Process 219 (1999).

outside of the jurisdiction of the court constitutes a de facto
deprivation of post-deprivation remedy); Weller v. Dep't of
Social Servs., 901 F.2d 387, 396 (4th Cir. 1990) (same).  Indeed,
Mouna and Sofia received no procedural protections at the time of
the state's decision to take emergency custody of Sofia or the
state's decision that resulted in Mouna's permanent deprivation
of custody.  Rather, Murphy and the police defendants allegedly
took it upon themselves to determine Sofia's custodian.  Such
hasty executive determinations of custody are unconstitutional:
"Procedure by presumption is always cheaper and easier than
individualized determination.  But when . . . the procedure
forecloses the determinative issues of competence and care, . . .
it needlessly risks running roughshod over the important
interests of both parent and child.  It therefore cannot stand."
Stanley, 405 U.S. at 656-57.[19]  In light of Mouna's and Sofia's
clearly established right to notice and a hearing on custody, a
reasonable person under these facts would have known that turning

---

[19] Although the Supreme Court has explicitly stated that
family rights are far more precious than property rights,
Stanley, 405 U.S. at 651, one cannot help but wonder if the
defendants would have acted with such presumptiveness had Sofia
been a car in state custody, over which Mouna and the Kandys
disputed ownership.  No reasonable person would allow the Kandys
to drive off with the car without a court order or clear proof of
ownership.  The car would have remained in state custody.  Mouna
and Sofia should have been afforded no less procedural
protection.

a child over to a person, who he should have known would abscond with her, would result in a de facto violation of that right.[20]

Because the Court concludes that Murphy violated the clearly established substantive and procedural due process rights of both Mouna and Sofia, the Court holds that qualified immunity does not apply to the section 1983 claims presented here.[21]

## IV.  Conclusion

The Court GRANTS IN PART and DENIES IN PART the motion of the District Attorney's Office and Murphy [docket no. 37].  As to Count II, the negligence claim under the Massachusetts Tort Claims Act, the Court GRANTS the motion to dismiss the claims against Murphy, except to the extent that the Amended Complaint states a claim for intentional infliction of emotional distress

---

[20] Although not raised by the parties, at this stage of the proceedings the Court is unwilling to conclude that the doctrine espoused in Parratt v. Taylor, 451 U.S. 527 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986) is applicable because there does not appear to be an adequate post-deprivation remedy for Mouna and Sofia.  See Weller, 901 F.2d at 394 (distinguishing Parratt on the ground that the "liberty interest implicated . . . is of far greater import, and we find a state tort remedy particularly inappropriate here").

[21] Both Murphy and the District Attorney's Office dispute whether the complaint sufficiently alleges threats, intimidation, or coercion, as is required in order to allege a violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, 11I.  Yet the Amended Complaint does not assert such a claim against Murphy or the District Attorney's Office.  Am. Compl. Counts II, IV, X.  Because the other defendants have not moved to dismiss at this stage of the litigation, the Court makes no determination as to the sufficiency of the plaintiffs' allegations under the Massachusetts Civil Rights Act.

against Murphy in his individual capacity.  The motion is DENIED

as to the District Attorney's Office, except to the extent that

the Amended Complaint states a claim against it for intentional

infliction of emotional distress.  The Court DENIES the motion to

dismiss as to the section 1983 claims, Counts IV and X, lodged

against Murphy in his individual capacity, because neither

absolute nor qualified immunity extend to his conduct here.

WILLIAM G. YOUNG
CHIEF JUDGE